1  Stephanie L. Krafchak
   KRAFCHAK & ASSOCIATES
   2029 Century Park East, Ste. 900
2  Los Angeles, California 90067

3  Tel: 310.772.0034
   Fax: 310.772.0121
4

5  Attorneys for B.R. Family Partners, LP
   and William L. Rogers
6

FILED
JAN - 4 2006
CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

7
8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                 SAN FERNADO DIVISION

11  In re                      )    Case No.: SV 04-16437 GM
                                )
12        PALOMBA WEINGARTEN   )    Chapter 11
                                )
13            Debtor            )    OPPOSITION TO MOTION THAT THE COURT
                                )    ORDER THE U.S. TRUSTEE TO REMOVE
14                              )    WILLIAM ROGERS FROM THE CREDITORS
                                )    COMMITTEE ON THE GROUNDS OF WILFUL
                                )    MISCONDUCT
15  _____ )

16                              DATE:   January 18, 2006
                                TIME:   10:00 a.m.
17                              CTRM:   303
                                        21040 Burbank Blvd.
18                                      Woodland Hills, California

19
20
21
22
23
24
25
26
27

1

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | THERE IS NO AUTHORITY TO SUPPORT THE MOTION. | P. 3 |
| 2. | THE MOTION IS PART OF DEBTOR'S ONGOING ATTEMPTS AT DISBANDING THE CREDITORS COMMITTEE | P. 4 |
| 3. | THE DEBTOR HAS ENGAGED IN EXTORTION TO ATTEMPT TO FORCE ROGERS AND BRFP INTO A SETTLEMENT. | P. 5 |
| 4. | THE MOTION IS A TRANSPARENT ATTEMPT BY DEBTOR TO OBTAIN A DE FACTO SUMMARY ADJUDICATION OF ISSUES WHICH RELATE TO DEBTOR'S CLAIM OBJECTIONS | P.7 |
| 5. | THE MOTION IS AN ATTEMPT TO IMPROPERLY OBTAIN AND ADVANTAGE BY TAINTING THE COURT AS TO ROGERS HONESTY AND VERACITY BEFORE THE HEARING; THE ALLEGED LIES ARE TESTIMONY TAKEN OUT OF CONTEXT, AND ROGERS SHOULD BE AFFORDED AN OPPORTUNITY TO HAVE HIS HONESTY AND TRUTHFULNESS TESTED BY THE OFFICE OF THE UNITED STATES TRUSTEE WHICH APPOINTED HIM TO THE CREDITORS COMMITTEE AND, IF REQUIRED BY THE COURT. | P.9 |
| 6. | CONCLUSION | P.26 |

# TABLE OF AUTHORITIES

**Cases**

| | |
|---|---|
| Westmoreland Human Opportunities v. Walsh, 246 F.3d 233, 256 (3rd Cir. 2001) | 4,5 |
| In re Life Service Systems, Inc., 279 B.R. 504 (Bankr. W.D. Pa. 2002) | 5 |
| In re Mountain States Power Co., 118 F.2d 405 (3rd Cir. 1941) | 5 |
| MacDonald v. Musick, 425 F.2d 373, 375 (9th Cir.1970) | 6 |
| Barton v. State Bar, 2 Cal.2d 294 (1935) | 7 |
| Carney v. Rotkin, Schmerin & Mcintyre, 206 Cal.App.3d 1513 (1988 | |
| Flatley v Mauro, 121 Cal.App.4th 1523, 1541 (2004) | 8 |
| Kinnamon v. Staitman & Snyder, 66 Cal.App.3d 893 | 8 |
| Nguyen v. Proton Technology Corp., 69 Cal.App.4th 140 (1999) | 8 |

**Statutes**

| | |
|---|---|
| 18 U.S.C.§1951(2) | 6 |
| Cal.Pen.C § 518, 519 | 6 |

**Rules**

| | |
|---|---|
| .   Rule 5-100A of the California Rules of Professional Conduct | 7 |

TO THE HONORABLE GERALDINE MUND, THE OFFICE OF THE U.S. TRUSTEE, THE DEBTOR, THE CREDITORS AND ALL INTERESTED PARTIES:

William L. Rogers("Rogers") and B.R. Family Partners, L.P., a Texas limited partnership, ("BRFP") opposes Debtor's Motion That The Court Order the U.S. Trustee To Remove William Rogers from the Creditors Committee On The Grounds of Wilful Misconduct ("Motion") on the following grounds:

1. There is no authority to support the Motion.
2. The Motion is part of Debtor's ongoing attempt to disband the Creditors Committee.
3. The Motion is a continuation of the Debtor's attempts to extort a settlement from Rogers and BRFP.
4. The Motion is a transparent attempt by Debtor to obtain a de facto summary adjudication of issues which relate to their claim objections.
5. The Motion is an attempt to improperly obtain an advantage in front of the Court by tainting the Court against Rogers prior to the hearing on whether the statute of limitations has run on BRFP and Rogers' fraud in the inducement claims.
6. The alleged lies are nothing more than testimony taken out of context, which even in their out of context state could barely rise to the level of being used for impeachment purposes. The Motion is Debtor's attempt to obfuscate the fact that at least three (3) courts and the Examiner have found the Debtor to be a person who will lie and hide the truth whenever it suits her needs.

**1. THERE IS NO AUTHORITY TO SUPPORT THE MOTION.**

The Debtor relies on the case of Westmoreland Human Opportunities v. Walsh, 246 F.3d 233, 256 (3rd Cir. 2001) for the proposition that, as the Debtor puts it, "[a] creditor violates his fiduciary duty to the other committee members when he pursues a course of action that furthers his self-interest to the potential detriment of fellow committee members." The issue in Westmoreland was whether a committee member had a fiduciary duty, and if so, whether it breached that duty, by failing to disclose that it had an interest in property that was not property of the Debtor's estate under

4

1  11 U.S.C. Sec. 541. The remedy sought in that case was monetary damages against the committee
2  member. Westmoreland, 246 F.3d at 257-58.
3        In re Life Service Systems, Inc., 279 B.R. 504 (Bankr. W.D. Pa. 2002) the court awarded the
4  debtor damages against the committee member for breach of fiduciary duty. The court noted that
5  "[i]n particular, a committee member may not use its position on the committee to advance its own
6  personal interests." Life Service, 279 B.R. at 513.
7        In In re Mountain States Power Co., 118 F.2d 405 (3rd Cir. 1941), the Court of Appeals
8  held that the chairman of the debtor's preferred stockholders' committee was properly denied
9  compensation and reimbursement of expenses by the district court, where the chairman was a member
10 of a firm of securities dealers that was at the same time trading in the debtor's stock. Mountain
11 States, 118 F.2d at 407.
12       Debtor has not alleged facts against Rogers which fall within the ruling of any of the
13 foregoing cases.

2. **THE MOTION IS PART OF DEBTOR'S ONGOING ATTEMPTS AT DISBANDING THE CREDITORS COMMITTEE.**

As set forth more fully in the Committee's Supplemental Reply of Official Committee of Unsecured Creditors in Support of Motion for Appointment of Chapter 11 Trustee (Responds to Debtor's Supplemental Opposition Brief); Declaration of Alan Tippie ("Committee Supplemental Reply" See, Request for Judicial Notice ["RJN"] Ex. 1) Debtor has engaged in a pattern of causing creditor claims to be purchased and demanding immediate resignation from the Committee. In the case of Wenner & Associates' claim, resignation from the Committee was actually a condition precedent to Wenner & Associates ability to receive its money. (RJN Ex.2) As set forth below, Debtor attempted to force BRFP and Rogers to sell their claims for pennies on the dollar through extortionary tactics which included demands that Rogers immediately resign from the Committee. In fact, Debtor through her agent Ginsberg, went so far as to demand that Rogers resign from the Committee in order to keep settlement discussion open. When it became clear to Debtor that Rogers and BRFP would not settle for pennies on the dollar and that neither would give in to extortion,

5

Debtor filed this motion.

Debtor voluntarily chose to file a petition in bankruptcy rather than post bonds while appealing a judgment (approximately $10 million). Debtor knew, or should have known, that by filing for bankruptcy protection she was subjecting herself to certain fiduciary duties and obligations, including an obligation to deal with all of creditors fairly. However, as shown by her attempts to disband the Creditors Committee, Debtor has no intention of dealing with her creditors on fair and equitable basis, thus, her need to divide and conquer.

Given the extraordinary facts surrounding the Debtor's ongoing attempts to disband th Committee, including this frivolous Motion, the Motion should be denied.

## 3. THE DEBTOR HAS ENGAGED IN EXTORTION TO ATTEMPT TO FORCE ROGERS AND BRFP INTO A SETTLEMENT.

"The term 'extortion' means the obtaining of property from another, with his consent induced by the wrongful use of actual force, violence or fear, under color of official right." 18 U.S.C.§1951(2). The California Penal Code similarly defines extortion as "...obtaining property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, under color of an official right." Cal.Pen.C.§518. "Fear, such as will constitute extortion, may be induced by a threat either: ... 2. To accuse the individual threatened, or any relative of his family, of any crime; or 3. To expose, or to impose him or them any deformity, disgrace or crime; ...." Cal.Pen.C §519. See also, *MacDonald v. Musick*, 425 F.2d 373, 375 (9th Cir.1970). Debtor, through her long time friend, business associate and counsel to her husband Gerry Ginsberg, has threatened Rogers with criminal prosecution in order to force him to sell his claim to an undisclosed third party for pennies on the dollar. (RJN Ex. 3). Mr. Ginsberg made it clear to Mr. Rogers that he should resign immediately from the Committee and that if he did not sell his claim and resign he would be in a lot of trouble as the proofs of claim filed by Rogers and BRFP constituted criminal acts. ( RJN Ex. 3.) In their last conversation in late October, 2005, Mr. Ginsberg informed Mr. Rogers that if Rogers did not sell his claim and that of BRFP for $450,000 that he would have to go to court on December 7, 2005 and was going to go to jail. (RJN Ex.3.) At the time the threat was

6

made neither Rogers nor his counsel had notice of a hearing scheduled for December 7, 2005. In fact, the first notice concerning a hearing scheduled for December 7, 2006 was not received until November 15, 2005 when Debtor caused this Motion to be personally served on counsel for Rogers and BRFP.

As was later learned by Rogers, Mr. Ginsberg[1] is a lawyer who practices with Christensen Miller, et al., which firm previously represented Debtor in the Pointe I Litigation and which represents Debtor's husband in this bankruptcy[2].

In addition to the threats made by Mr. Ginsberg, Mr. Eisenberg has repeatedly made statements that the proofs of claim are "bogus" and has alluded to "we all know what that means". Most recently, Mr. Eisenberg indicated that the mere filing of it constituted a crime. Rule 5-100A of the California Rules of Professional Conduct prohibit members of the California bar from " . . .threaten[ing] to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute." See also, *Barton v. State Bar*, 2 Cal.2d 294 (1935) [attorney Barton was disbarred for engaging in conduct constituting moral turpitude and dishonesty for attempting to obtain a "shakedown" settlement by making statements such as "that the matter is really for the district

---

[1] As set forth in Mr. Rogers declaration, Mr. Ginsberg failed to inform Rogers that he was working for Christensen Miller. Mr. Ginsberg had filed a declaration with this Court dated June 15, 2005 in support of the Debtor's objection to BRFP's claims in which he fails to disclose the fact that he was associated with Christensen Miller. Mr. Ginsberg misleadingly states simply that he is the "President of Whitehall Reality Corp." Recently, Mr. Ginsberg has filed a declaration in which he denies all attempts at extortion and states that Mr. Rogers knew that Ginsberg is a lawyer. As set forth in Rogers prior declaration, yes, Mr. Rogers knew that Mr. Ginsberg had gone to law school but that Rogers had always known Mr. Ginsberg as a business man who happened to have a background in law. In addition, as set for in the Committee's December 7th Supplemental Memorandum, Mr. Ginsberg represented to Margaux Ross, Esq., counsel for the Office of the United States Trustee that he did not represent any party in this case. Although Mr. Ginsberg denies that he "personally" represented Mr. Weingarten, he does not deny that he is an attorney with Christensen Miller or that Christensen Miller represents Mr. Weingarten. Mr. Ginsberg's denials are without merit.

[2] As more fully set forth in the Supplemental Memorandum of Points and Authorities in Support of Motion of the Official Committee of Unsecured Creditors for the Appointment of a Chapter 11 Trustee to Administer the Debtor's Estate; Declarations of Alan G. Tippie and Howard Madris in Support Thereof (filed on December 7, 2005) (RJN Ex. 4) that Debtor's counsel engaged in over 100 phone conversations and/or meetings with Debtor's husband and/or his lawyers including Christensen Miller. Among the topics discussed by Debtors counsel and Mr. Weingarten and/or his counsel was the claims of BRFP and Rogers. (Pp.31-33 of December 7, 2005 Supplemental Memorandum).

7

attorney . . " and that unless a settlement was reached that he would contact the press on behalf of his clients].

Any attempts by Debtor, her agents or counsel to claim that the statements are protected by the litigation privilege or their constitutional right to free speech must be dismissed. Extortion is not protected by the litigation privilege or the First Amendment. *Flatley v Mauro*, 121 Cal.App.4th 1523, 1541 (2004); *Nguyen v. Proton Technology Corp.*, 69 Cal.App.4th 140 (1999). In *Kinnamon v. Staitman & Snyder*, 66 Cal.App.3d 893, disapproved on other grounds, found that collection lawyers could not invoke the litigation privilege where in their efforts to collect a dishonored check the attorney wrote a demand letter which threatened to file a criminal complaint. In *Carney v. Rotkin, Schmerin & Mcintyre*, 206 Cal.App.3d 1513 (1988) the court refused to allow defendants to invoke the litigation privilege where counsel lied about the issuance of a bench warrant and offered to recall the bench warrant in exchange for immediate partial payment.

### 4. THE MOTION IS A TRANSPARENT ATTEMPT BY DEBTOR TO OBTAIN A DE FACTO SUMMARY ADJUDICATION OF ISSUES WHICH RELATE TO DEBTOR'S CLAIM OBJECTIONS

The issues of alleged perjury are intricately related to the statute of limitations issues which were originally set to be heard on December 22, to wit: "Rogers lied about" (a) "why he invested with Debtor", (b) "when he learned that Debtor did not own 100% of Astra Management", ( c) "whether he and BRFP were defrauded into entering into the January 1996 transaction," and (d) whether he and BRFP were defrauded into entering into the January 1996 transaction. Each of those claims of alleged perjury go to the heart of BRFP's claim for fraud in the inducement[3]. Apparently, Debtor has realized that she cannot argue her way around the fact that she contractually waived the statute of limitations so she is attempting to divert the Court's attention through the use of a smear campaign.

This is just another example of the fact that this Debtor will stop at nothing to continue her pattern of mismanagement and waste. Debtor has on many occasions tried to convince this Court that it is

---

[3] The objection to claim hearing does not include presentation of evidence or determination of the actual claim for fraud in the inducement but rather only a determination of whether the statute of limitations has run.

8

imperative to decide her objections to Rogers and BRFP's proofs of claim. The truth is that this series of objections will not change the economics of the claims and, therefore, is an enormous waste of estate assets. The BRFP proof of claim, is based on a series of contracts which were entered into in October 1997 following the original transaction which occurred in January, 1996. The contracts create the following rights and obligations: BRFP is the holder of a promissory note (Debtor has now conceded the amount due under the note[4]) which is a sum certain due and now uncontested; BRFP is entitled to a 15% Economic Interest (which Debtor now concedes cannot be finally calculated[5], and indemnification[6]. BRFP also alleged in its proof of claim and in its Complaint Objecting to the Dischargeability of the Debts and Debtors Discharge an alternative theory of recovery under fraud. With the exception of the possibility of punitive damages being awarded, there is no economic difference in the amounts contractually due to BRFP and an award of damages based on fraud. Since punitive damages are subordinated in bankruptcy there seems to be little point in litigating the fraud claims at this point in time. This is particularly true when at the present time there is virtually NO MONEY or assets in this estate. Yet, this Debtor, consistent with her historical pattern of never acting responsibly or within the confines of her fiduciary duties insists on litigating, bringing frivolous motions and engaging in obstreperous behavior for no legitimate purpose. The entire objection to claim process which has been pursued by Debtor and deemed by Debtor to be essential to rid her estate of "bogus" claims is a sham because even if the fraud in the inducement claims are

---

[4] Debtor's only real objection to the amount due under the Note was that BRFP had included all attorneys fees and costs under its calculation of the Note and included interest. Once BRFP understood Debtor's objection, it backed out attorneys fees and costs from the interest calculation, separated out fees and costs incurred defending the action by Gosnell and added interest to the defense attorneys fees and costs. The difference in the original amount claimed under the promissory note and the amount claimed after separating out collection fees and costs and indemnification fees and costs is negligible. Hardly what one would call bogus.

[5] While Debtor has conceded this amount cannot presently be calculated BRFP assumes that there will significant differences of opinion in the amount due to BRFP as its 15% Economic Interest.

[6] Each of the original proofs of claim included a demand for indemnification in excess of $10,000,000. BRFP and Rogers agreed on December 19, 2005 that as soon as their settlement with Robert Gosnell and his related entities is finalized that they will file an amended proofs of claim to remove $10,000,000 in indemnification claims.

9

found to be barred by the statute of limitations, the amount due to BRFP will be exactly the same except its claim for attorneys fees will be substantially higher, and BRFP's other 523 claims will remain. The situation with Rogers' individual claim is essentially the same.

Undoubtedly, Debtor will argue as her counsel did during the telephonic hearing on December 19, 2005, that without their objections the claims would not be resolved. Nothing could be further from the truth. First, the amount due under the Promissory Note was conceded by the Debtor. Second, BRFP made numerous offers to allow the Examiner to calculate the amount due under the Note. The Debtor refused all such offers. Third, a reduction of approximately $10 million from each claim has NOTHING to due with the Debtor's claim objection, it is a result of a pending settlement between BRFP and Rogers, on the one hand, and Robert Gosnell and his related entities, on the other hand. BRFP and Rogers would not have been required to file indemnification claims if Debtor had not engaged in fraud, breach of fiduciary duty, gross mismanagement and malice against Pointe, et al. Similarly, even if Debtor succeed on the statute of limitations issue, it will have no net effect on the amount due to BRFP and Rogers. The issue to be heard on January 18, 2006 is whether the statute of limitations has run with regard to BRFP and Rogers claims of fraud in the inducement. It has no effect on their remaining claims. In other words, even if BRFP and Rogers lose every fraud claim raised in their claims, the amount contractually owed by Debtor will remain the same. This is just another exercise in futility, a gross waste of estate assets and further evidence of the fact that Debtor prefers to spend every penny litigating even when there is NO ECONOMIC BENEFIT to the estate possible from such litigation.

5. **THE MOTION IS AN ATTEMPT TO IMPROPERLY OBTAIN AND ADVANTAGE BY TAINTING THE COURT AS TO ROGERS HONESTY AND VERACITY BEFORE THE HEARING; THE ALLEGED LIES ARE TESTIMONY TAKEN OUT OF CONTEXT, AND ROGERS SHOULD BE AFFORDED AN OPPORTUNITY TO HAVE HIS HONESTY AND TRUTHFULNESS TESTED BY THE OFFICE OF THE UNITED STATES TRUSTEE WHICH APPOINTED HIM TO THE CREDITORS COMMITTEE AND, IF REQUIRED BY THE COURT.**

1   The Debtor has engaged in the artful craft of carving testimony out of context, has wholly
2 ignored testimony, portions of the proofs of claim and in some cases just engages in pure argument
3 without offering competent contradictory evidence to support her contentions. What is also shown by
4 the testimony is a learning curve on Mr. Rogers part. Below is a sampling of the testimony quoted by
5 Debtor and now, placed into context.

6   Debtor's first point in her chart is that "Rogers invested it the San Diego Property so that the
7 Debtor could realize tax losses." (P.5:12-13 of Motion.)   THIS IS A GIANT RED HERRING.
8 Beginning on pp. B-010 through 012 of the Rider Declaration filed in support of this Motion, Rogers
9 and BRFP provide historical facts regarding their initial exposure and involvement with Debtor in the
10 San Diego Property.  "Rogers, on behalf of BRFP, reluctantly agreed to invest in the project as a
11 result of (a) his friendship with the Debtor (and her husband), and (b) the promises and
12 representations made by Debtor, including but not limited to her promise that BRFP would receive
13 priority distributions such that its $1.8 million investment was promised to be returned quickly and
14 with priority[7]." (B-012 to Rider Decl.) "BRFP entered into the Letter Agreement, Property Purchase
15 Agreement and WW1 Operating Agreement in reliance on Debtor and Debtor Related Entities'
16 presentations that: (1) BRFP would be paid a priority distribution as set forth above regardless of
17 specified reserves, (ii) Debtor's ownership of Astra was 100%, and (iii) no commissions would be
18 paid in connection with BRFP's purchase of an interest in the Property." (B-014-015 to Rider Decl.)
19 "Pursuant to the MOU and Purchase and Sale Agreement, Debtor and Debtor Related Entities made,
20 among others, the following representations, warranties and promises to Rogers and BRFP: (a)
21 "Atlas Holdings represents and warrants that it owns 100% of Astra's common stock." (b) Atlas
22 Homes is obligated to pay to BRFP the sum of $2,110,000 ("Purchase Price"), payable as follows: (i)

---

[7] In the preceding sentence Rogers and BRFP do allege that "Mr. Weingarten told Rogers that the Debtor and/or Astra wanted to invest in the Spring Valley Project because he and Debtor believed it to be (i) a potentially good real estate investment, and (ii) a unique investment form which they could utilize the large tax loss carryforward (from Gosnell's prior losses that Gosnell had generated principally unsing the LTCB's monies) to (a) potentially legitimately save for the Weingarten family's interests almost $8 million (and use half of such savings to pay for the effective purchase of the Property) in 1995 taxes from the approximately $20 million in income that Debtor had generated in 1995, and (b) protentially legitimately shelter almost $60 million in income (thus saving and estimated $24 million in taxes) going forward." P.B-012 Rider Decl.

11

$900,000 cash, plus; (ii) That certain Secured Promissory Note in the principal face amount of $1,210,000 ("Note") made by [Delaware] Atlas Holdings, . . .; ( c) That if Gosnell proceeds as outlined in the Mediation Agreement then Debtor and/or Debtor Related Entities, or their respective successors and assigns will proceed as outlined herein. . . . .; (d) Debtor and Debtor Related Entities agreed to indemnify and hold harmless Rogers and BRFP against and from any and all claims, demands, liabilities, losses, obligations, suits, damages, causes of action, costs, judgments, and expenses of any nature (including reasonable attorney fees), arising out of, based upon, or resulting from: . . . ; (e) Debtor and/or Debtor Related Entities would use their best efforts to record the Deed of Trust in favor of BRFP, (f) that no additional loans would be obtained or liens recorded against the Property without BRFP's consent which would not be unreasonably withheld. None of the foregoing representations and warranties was true at the time they were made. Debtor knew said representations were either false or that she had no intention of performing as promise, at the time she made them. Debtor made such presentations with the specific intent to induce Rogers and BRFP into entering into the October 20, 1997 Transaction which converted BRFP from its position as an equity member of WW1 to its current position as a lender." (Pp. B-021-023 to Rider Decl.). Thus, neither Rogers nor BRFP allege that BRFP invested so that Debtor could realize tax benefits, rather Rogers and BRFP allege a recollection of what was told to them as one of the reasons Debtor wanted to invest in the property.

The testimony quoted by Debtor, however, meaningless in light of the foregoing, is also grossly taken out of context. For example, the testimony immediately preceding the Debtor's selective quotation is the following testimony (including the section quoted by Debtor):

Testimony omitted (Declaration of Stephanie L. Krafchak ("Krafchak Decl.") at Ex. 1:

Q: Do you know if the property had any tax benefits associated with it?

A: There was a discussion of some tax benefits. I was not participating in those tax benefits, and so I can't give you any understanding of what those benefits were or how they were to be achieved.

Testimony quoted:

> Q: Do you know if Ms. Weingarten invested in The Pointe San Diego property because of the tax benefits?
>
> A: I don't know.

The question asked of Rogers was whether he "knew" why Debtor invested in the project. The question did not ask Rogers "understanding" of why she invested or if Debtor had told Rogers why she was investing. Rogers answered the question truthfully because he was not inside of Debtor's head to be able to state unequivocally why Debtor invested, and since BRFP was not to share in the tax benefits, Rogers did not particularly care why or how the tax benefits would be realized. In addition, for several pages preceding this question, the questions and testimony concerned the structure of the transaction, i.e., that Debtor's related entities were involved in the purchase, that BRFP purchased an interest in the property from one of Debtor's related entities and then BRFP contributed that interest in the property to another related entity. At the time the question was asked there had been no determination of alter ego and Rogers had no reason to believe the related entities were the alter egos of Debtor. Accordingly, Rogers appears to have directly answered the question which was asked and not the twisted interpretation of the question as suggested by Debtor.

Thus, the POC/Claim Narrative does not allege that Debtor invested into the project solely on the basis of tax benefits.

Quoted testimony:

> Q: Do you know how much Ms. Weingarten or her entity invested in The Pointe San Diego?
>
> A: No.
>
> Q: Do you know whether she had the capability of investing an additional $1.8 million?
>
> A: No.
>
> Q: Do you have any understanding of why she asked you to put $1.8 million in the project?
>
> A: I think to her at the time it was probably an assurance that someone else believed that there was something here that long-range might be profitable and that having some money involved and having a profit participation flow down hopefully some large

13

1   dollars to my kids trusts, that I would stay involved, stay interested, and be able to give

2   her advice and thoughts when she needed it.

3 Omitted testimony (which precedes the quoted testimony) (Krafchak Decl. Ex. 2):

4 At p. 92 of the Deposition transcript the following questions and answers took place:

5   Q:   Do you know why BR Family purchased directly from Astra versus just investing in an

6        LLC that held the property?

7   A:   No.

8 At p. 94 the testimony continues but was omitted by Debtor (Krafchak Decl. Ex. 3):

9 p.94:11:

10  Q;   Did the two of you ever discuss what she would do in connection with investing in the

11       project if you didn't make the investment?

12  A:   No

13  Q:   Do you know if her investing in the project was contingent on your investment?

14  A:   I don't know.

15  Q:   Did she ever tell you whether she would invest in the project if she didn't have the

16       assurance that came along with your $1.8 million investment?

17  A:   I don't remember that.

18  Q:   And when you invested in the project, you believed you'd get your 1.8 million back in

19       three to six months?

20  A:   Yes.

    .....

21  Q:   You didn't want to invest in this project, did you?

22  A:   I had a lot of other opportunities

23  Q:   So you didn't want to invest in this project?

24  A:   I had no desire to be in a residential development in San Diego with good returns when

25       I can invest as a general partner, which Garry, to your left, will explain, has multiple of

26       good returns.

27

14

1     Q:     So you were reluctant to make the investment in this project:

2     A:     I had — this was not my top priority of how to spend my dollars.

3     Q:     And Ms. Weingarten forced you to invest in this project; isn't that true?

4     A:     No.

5     Q:     Didn't you understand that you were — your investment was needed to in order to accomplish the tax structure that Ms. Weingarten was trying to accomplish?

7     A:     No.

The testimony immediately preceding the testimony bracketed by Debtor concerns questions regarding BRFP's original purchase of a 31% interest in the property which was then contributed to WWI for a 25% interest. The questions and answers in brackets are completely out of context. In other words, Mr. Stauss is asking Mr. Rogers if he knew whether the structure, i.e., that an interest in the property was first purchased and then contributed to WWI, instead of direct investment of dollars into WWI was done for tax purposes.

On page 636 of the trial testimony (p. D-063 of the Exhibits to Rider's Declaration) the questions are as follows:

Omitted testimony:

Q:     All right. Now, you don't know why the deal [ie. The purchase of the property first then contribution to WWI] was structured this way, correct?

A:     No.

Q:     You could have just invested in the LLC, just bought a 25% interest in the LLC, couldn't you?

A:     If the effective economic interest would have given me 25%, I could have. I don't know why it was structured this way.

Quoted testimony:

Q:     Well, isn't the reason it was structured this way is for the tax reasons?

A:     I don't know.

Q:     Wasn't it structured this way so Ms. Weingarten could then realize, through a taxable

15

event, i.e., sale of land, the losses against Pilgrim gain?

A: I don't know.

Q: And that's the reason you invested, so she could take the loss, isn't it?

A: No.

Thus, it is clear that Mr. Rogers was responding to questions concerning whether he knew why the transaction was structured so that BRFP would purchase an interest in the land first, and then contribute the land to the WWI (the LLC) and if that particular structure would trigger tax losses. Mr. Rogers was being asked about his knowledge not what Debtor, her husband or their agents may have told Mr. Rogers. Mr. Rogers had no independent knowledge of the facts surrounding the tax benefits, usage of the tax benefits or whether the deal had to be structured as first a land purchase, then a contribution of land to an LLC in order to trigger the tax benefits.

Another quote taken out of context is found on p. 7:5-8 of the Motion:

Testimony quoted:

Q: Didn't you understand that you were – your investment was needed in order to accomplish the tax structure that Ms. Weingarten was trying to accomplish?

A: No.

However, the preceeding line of questions led Mr. Rogers to believe that the question was whether he understood that Ms. Weingarten would not invest unless Rogers and/or BRFP invested too. (See, supra at p. 13). The questioner did not ask if any third party could have invested.

<u>Rogers Did Not Lie About When He Learned that Debtor Did Not Own 100% of Astra Management</u>

Again, a Red Herring, which goes to whether the statute of limitations has run on claims based upon fraud in the inducement which even if ultimately lost will have NO ECONOMIC IMPACT on the claims of Rogers and BRFP (except to the extent of punitive damages which at this point have little or no hope of ever being recovered in this estate because the estate is administratively insolvent). There is nothing in the testimony edited by Debtor which comes close to proving a lie or perjury. In fact, to the contrary, Debtor made the following representation in the Purchase and Sale Agreement[8]

---

[8] The Purchase and Sale Agreement is dated as of October 22, 1997 but was executed several months later.

16

(exhibit 8 to the POC): ¶ C. Astra owns a seventy-five percent (75%) Percentage Interest in W.W.I. Atlas Holdings[9] represents and warrants that it owns one hundred percent (100%) of Astra's common stock." Mr. Rogers and BRFP were entitled after months of hard negotiations to rely on this written representation when entering into the October 1997 transaction.

The testimony extracted from the Pointe 1 deposition (February 14, 2001) shows a line of questions which goes to whether Rogers considered the Pointe San Diego Residential in BRFP's decision to sell its interest in WWI. And there is only a question which was whether "The Pointe a shareholder in Astra?" The fact that an attorney representing Pointe <u>asked</u> Rogers if the Pointe was a shareholder of Astra does not equate to knowledge on the part of Rogers that Pointe owned shares of Astra stock, particularly when BRFP and Rogers were in possession of a written representation and warranty from Debtor and her Related Entities that Atlas Holdings owned 100% of Astra.. At no point in this utterly disingenuous Motion does Debtor mention that at p. 78 (Krafchak Decl. Ex 4) of the very same Pointe 1 deposition (February 14, 2001) the following testimony took place:

Q: Do you know if Pointe San Diego had any interest in the residential property following the closing of the transaction.

A: I don't know.

Q: Do you recall if Pointe was a Class A Shareholder in Astra?

A: I don't know.

In 2001, Rogers had no reason to believe that Debtor was in the process of defrauding him. Rogers testified repeatedly in the same deposition that he "trusted the her [Debtor]". While in retrospect such trust was misplaced, hindsight is almost always 20-20.

---

[9] This Atlas Holdings being a Delaware corporation, as described in the first paragraph of the Purchase and Sale Agreement, which did not exist at the time the Purchase and Sale Agreement was entered into. Of course, there are two misrepresentations in that written representation contained in the Purchase and Sale Agreement. First, Atlas Holdings, a Delaware corporation which is the party who proportedly entered into the agreement did not exist at the time the agreement was executed. (See, RJN Ex 5, Examiner's Report #2). Second, Atlas Holdings (a non-existent entity) did not own 100% because Pointe owned 1000 share of the Class A common stock, yet the Debtor had no hesitation to execute multiple documents in connection with the October 1997 transaction on behalf of the non-existent Atlas Holdings or to represent and warrant that the non-existent entity owned 100% of the stock in Astra.